

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **BRENDA HAWKINS TUCKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-1786-NW** |
| | ) | |
| **CITY OF FLORENCE,** | ) | |
| **ALABAMA, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Brenda Hawkins Tucker,[1] asserts in this action that she was tortiously injured and that her constitutional rights were violated as a result of her arrest and prosecution on drug-related charges, as well as the investigation that preceded and the fallout that followed those events, in November and December of 2007.[2]  Plaintiff initially asserted claims against six different defendants, but during the course of this

---

[1] The record in this case discloses a significant degree of confusion regarding plaintiff's name, in that she has been married five times and her legal surname has, thereby, changed multiple times.  *See* doc. no. 106, Ex. A (Deposition of Brenda Tucker), at 28-35, 68-69 [hereinafter First Deposition of Brenda Tucker].  However, the record similarly discloses that plaintiff prefers to be called "Brenda Tucker" and she has asserted that this is her present legal name.  *E.g.*, doc. no. 106, Ex. H (Deposition of Tim Glover), at 59-60 [hereinafter Deposition of Tim Glover]; doc. no. 106, Ex. N.  As the evidence in this case stretches back over several years, plaintiff is sometimes referred to by other names in the documents the parties have submitted.  *E.g.*, doc. no. 106, Ex. D, at 2-3 (containing plaintiff's signature as "Brenda Hawkins" and patient records referring to plaintiff as "Brenda Vinson"); doc. no. 114, Ex. O, at 6 (naming plaintiff "Brenda Faye Hawkins, aka, Brenda Vinson").  To the extent utilizing plaintiff's name is necessary in this opinion, the court will use plaintiff's preferred iteration of her name.

[2] *See generally* doc. no. 1 (Original Complaint), *passim*.

action she has agreed to the dismissal of all but the following three defendants:[3] the

City of Florence, Alabama; Myron Crunk, the Director of the Lauderdale County

Drug Task Force ("LCDTF"); and, LCDTF Agent Timothy Glover. Plaintiff asserts

three claims against these three defendants pursuant to 42 U.S.C. § 1983: that is, that

her constitutional rights under the Fourth and Fourteenth Amendments to the United

States Constitution were violated because she was maliciously prosecuted, arrested

without probable cause, and arrested on a warrant obtained by abuse of legal process.[4]

Plaintiff also asserts supplemental state-law claims against the remaining defendants

for malicious prosecution, libel, abuse of process, and invasion of privacy under

Alabama tort law.[5]

This action is presently before the court on a motion for summary judgment

jointly filed by the remaining defendants. Upon careful consideration of the motion

---

[3] *See* doc. no. 20 (Stipulation of Dismissal as to all claims asserted against former defendant New York Times, Holdings, Inc., doing business as Times/Daily Newspaper); doc. no. 98, Ex. 1 (Stipulation of Dismissal as to all claims asserted against former defendant Lauderdale County, Alabama); doc. no. 99, Ex. 1 (Stipulation of Dismissal as to all claims asserted against former defendant the Lauderdale County Drug Task Force); *see also* docs. no. 21 & 100 (orders dismissing these defendants pursuant to plaintiff's stipulations).

[4] Doc. no. 1 (Original Complaint), ¶¶ 25-34 (Count I, which, though poorly drafted, appears to assert claims for malicious prosecution and false arrest); *id.* ¶¶ 50-65 (Counts V and VI, which appear factually duplicative in all relevant respects, but that appear to assert a claims for abuse of process under state and federal law); *see also* doc. no. 24 (First Amendment to Complaint, asserting additional facts to support plaintiff's allegations against the City of Florence); doc. no. 38 (Second Amendment to Complaint asserting additional facts to support plaintiff's allegations against the City of Florence).

[5] Doc. no. 1, ¶ 35 (Count II, state law malicious prosecution); *id.* ¶¶ 36-41 (Count III, state law libel); *id.* ¶¶ 42-49 (Count IV, state law invasion of privacy).

and in light of the parties' briefs and evidentiary submissions, the court concludes that defendants' motion for summary judgment is due to be granted as to all federal claims asserted in this action. Consequently, the court will decline to exercise supplemental jurisdiction over the remaining state-law claims, and this action shall be dismissed in its entirety.

## I. STATEMENT OF FACTS[6]

During the 1970s and early 1980s, plaintiff, Brenda Tucker, regularly abused and ultimately became dependent upon a litany of controlled substances, including various prescription opiates and other narcotics obtained either from physicians or on the street.[7] Plaintiff overcame her addiction in 1986[8] and, thereafter, began volunteering in drug and alcohol addiction rehabilitation programs.[9] On November 23, 1993, she opened a facility named "Freedom House."[10] Plaintiff was the sole founder of Freedom House which, at all times relevant to this action, was the only certified inpatient drug and alcohol dependence treatment facility for females in

---

[6] At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party." *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003). "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts." *Id.* (alterations supplied); *see also, e.g., Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).

[7] First Deposition of Brenda Tucker, at 35-41, 54-56, 97, 225-26; doc. no. 106, Ex. B (Second Deposition of Brenda Tucker), at 67-68 [hereinafter, Second Deposition of Brenda Tucker].

[8] First Deposition of Brenda Tucker, at 54-56.

[9] *Id.* at 44, 50-52

[10] *Id.* at 52.

Northwest Alabama.[11]  Plaintiff secured certification and funding for Freedom House

from the Alabama Department of Health.[12]  At the time of the events at issue here,

plaintiff was both an employee of the corporation doing business as Freedom House,

Substance Abuse Council of Northwest Alabama, Inc., and its President-Director.[13]

She subsequently relinquished the position of President at the request of the Alabama

Department of Mental Health.[14]

At some point in 2006, plaintiff began experiencing a number of medical

maladies that ultimately resulted in a series of six, painful surgeries.[15]  Despite

plaintiff's history of addiction to prescription medications, particularly opioids, she

was prescribed and began taking during this time a number of analgesics classified

as controlled substances under Alabama law.[16] These included, among several others,

oxycodone, an opioid analgesic; hydrocodone, an opiod analgesic; hydropmorphone,

an opiod analgeisc; and butalbital, a barbituate analgesic.[17]  A number of medical

---

[11] *Id.* at 61-66, 167-68, 172-73.

[12] *Id.* at 66, 168.

[13] *Id.* at 194-96.

[14] First Deposition of Brenda Tucker, at 196.

[15] *Id.* at 161; doc. no. 114, Ex. A, at 7-8; Second Deposition of Brenda Tucker, at 30-31.

[16] First Deposition of Brenda Tucker, at 114; Second Deposition of Brenda Tucker, at 29-35.

[17] *See* doc. no. 106, Ex. E, Tab 6 (printout of plaintiff's patient controlled substance prescription history report), at 1-2; doc. no. 106, Ex. J (First Affidavit of Linda Hammond-McCutchen), ¶ 6 [hereinafter First Affidavit of Linda Hammond-McCutchen].

professionals treated plaintiff during this period.[18]  According to plaintiff's testimony, each of her treating physicians required her to sign an agreement stating that she would not, without their knowledge, acquire prescriptions for controlled substances from other physicians or dentists, and warning her that doing so would result in termination of the doctor/patient relationship and possible prosecution under § 13A-12-212 of the Alabama Code.[19]

After she resumed taking opioids, plaintiff began requesting additional prescriptions from her doctors.[20]  It is undisputed that at least three of her treating physicians during this period refused her requests for additional opiod prescriptions.[21] Medical records maintained by one of her physicians, Dr. James Ryerson, indicate that another of her physicians, Dr. Michael Koslin, "asked that we not give [plaintiff] any pain meds or narcotics.  That she takes too many and will ask for them when

---

[18] *E.g.*, doc. no. 114, Ex. A, at 7; doc. no. 114, Ex. B, at 53, 58-61; First Deposition of Brenda Tucker, at 111-14, 116, 197-98; doc. no. 106, Exs. C & D (Certified Medical Records of James Ryerson, M.D., and George Evans, M.D., respectively).

[19] First Deposition of Brenda Tucker, at 204-05; *see also, e.g.*, doc. no. 106, Ex. D, at 2 ("Patient Physician Agreement" between plaintiff and Dr. George Evans).

[20] *E.g.*, First Deposition of Brenda Tucker, at 200-02 ("Q:  [Y]ou called Dr. Koslin's office to try to get pain medication, and they would not give you any more, correct?  A: I still had some. It wasn't working. . . .  Q:  And after that treating physician refused to give you any pain medication, you called Dr. Ryerson's office to see if they would give you any pain medication?  A:  And talked to him about why I was like that, because, you know, we had told Dr. Koslin that we were going to the beach on Saturday, and he said, 'Oh, you'll be fine,' and I wasn't.").

[21] First Deposition of Brenda Tucker, at 113, 199-204; Second Deposition of Brenda Tucker, at 102; doc. no. 106, Ex. B (Certified Records of James Ryerson, M.D., at 2-4); doc. no. 105, Ex. D, at 3; doc. no. 106, Ex. F, at 2.

nothing is wrong.  He feels she abuses narcotics and will not give them to her any longer."[22]

Rumors began to circulate in the substance abuse treatment community at some point in 2007 that plaintiff was "doctor shopping" for controlled substances (*i.e.*, seeking multiple overlapping prescriptions from multiple medical professionals) and abusing prescription drugs.[23]   Lorinda Hammond-McCutchen ("Hammond-McCutchen"), who then worked as a Court Referral Officer for Lauderdale County, Alabama, heard these rumors.[24]   She had known plaintiff for several years.[25] Hammond-McCutchen's duties as a referral officer included placing individuals who had been charged with or convicted of crimes in drug and alcohol rehabilitation programs and monitoring their compliance with the terms of those programs.[26]  She had regularly referred female addicts to plaintiff's facility, Freedom House.[27]

---

[22] Doc. no. 106, Ex. C, at 4 (entry on April 12, 2007); *see also id.* at 2 (entries from August 14 & 15, 2007) (indicating that Dr. Koslin's nurse had told Dr. Ryerson: "'DO NOT' give [plaintiff] anything for pain please").

[23] First Affidavit of Lorinda Hammond-McCutchen, ¶ 7; doc. no. 114, Ex. H (Second Affidavit of Lorinda Hammond-McCutchen), at 2-3 [hereinafter Second Affidavit of Lorinda Hammond-McCutchen].

[24] First Affidavit of Lorinda Hammond-McCutchen, ¶ 7; Second Affidavit of Lorinda Hammond-McCutchen, at 2.

[25] First Affidavit of Lorinda Hammond-McCutchen, ¶ 3.

[26] First Affidavit of Lorinda Hammond-McCutchen, ¶ 4; *see also* First Deposition of Brenda Tucker, at 169-80.

[27] First Deposition of Brenda Tucker, at 170; *see also* First Affidavit of Lorinda Hammond-McCutchen, ¶ 9.

In October of 2007, Ms. Hammond-McCutchen attended a statewide Court Referral Officer Conference in Orange Beach, Alabama.[28]  Plaintiff, as an important figure in the substance abuse field in the state, also attended.[29]  At the conference, Hammond-McCutchen observed plaintiff and noted that "she appeared . . . to be under the influence based on [Hammond-McCutchen's] experience and training in the substance abuse field because of the appearance of [plaintiff's] eyes, her gait, and yelling out inappropriately several times during one of the presentations."[30]  Because plaintiff, according to Hammond-McCutchen, was "acting and talking in a manner that was disruptive to meetings being held at the conference," and exhibited outward manifestations of intoxication, Hammond-McCutchen developed the "belie[f that] she was at that time under the influence of something."[31]  Hammond-McCutchen "became

---

[28] First Affidavit of Lorinda Hammond-McCutchen, ¶ 10.

[29] *Id.* ¶ 8; Second Affidavit of Lorinda Hammond-McCutchen, at 2.

[30] First Affidavit of Lorinda Hammond-McCutchen, ¶ 8.

[31] Second Affidavit of Lorinda Hammond-McCutchen, at 2.  Plaintiff disputes the assertion that she "appeared . . . to be under the influence" on the basis that Hammond-McCutchen "did not know what Brenda was under the influence of."  Doc. no. 114 (Plaintiff's Response to Defendants' Motion for Summary Judgment), at 4-5 [hereinafter Plaintiff's Response to Defendants' Motion for Summary Judgment].  This quibbling carp misses the point by a mile.  The disputed language is a *direct quotation* from Hammond-McCutchen's sworn affidavit and defendants make no attempt whatsoever to warp it into an assertion that Hammond-McCutchen was somehow able to divine the precise chemical compound responsible for plaintiff's inebriated appearance and actions.  First Affidavit of Lorinda Hammond-McCutchen, ¶ 8; doc. no. 105 (Brief in Support of Defendants' Motion for Summary Judgment), at 25 [hereinafter Brief in Support of Defendants' Motion for Summary Judgment].  Nor does plaintiff attempt to attack the credibility of Hammond-McCucthen, since she provides no evidentiary basis upon which a factfinder could reasonably draw the conclusion that Hammond-McCutchen's characterization is inaccurate.  Plaintiff's citation to *that actual quotation* (notably without the kind of "specific reference" required by D.2.a of Appx. II to

7

concerned that [she] could be put in the position of placing women at Freedom House for inpatient drug treatment under [plaintiff's] supervision when she might be abusing prescription drugs [herself]."[32]

That same month, Hammond-McCutchen happened to see defendant Tim Glover ("Glover") at either the Lauderdale County Courthouse or the City of Florence Municipal Courthouse.[33]  Glover had worked for the Police Department of the City of Florence, Alabama (the "City"), a defendant in this action, since 1997.[34]  In 2001, Glover joined the Lauderdale County Drug Task Force ("LCDTF") as an agent and he continues to serve in that position.[35]  Hammond-McCutchen knew that Glover was an LCDTF agent.[36]  Due to their mutual involvement in criminal proceedings for drug related offenses, the two had several professional interactions with one another during the years preceding the October 2007 meeting.[37]  Hammond-McCutchen told Glover

---

the Uniform Initial Order entered as doc. 34, at 16, in this action; *see also* Fed. R. Civ. P. 56(c)(1)(B), (e)(2)) fails entirely to support any dispute.  Rather, the dispute can only, and charitably, be characterized as a backhanded (and ineffective) attempt to circumvent the plainly set forth procedure for stating facts laid out in the Uniform Initial Order.  Upon that basis, the court deems this fact admitted.  *See* Fed. R. Civ. P. 56(e)(2).

[32] First Affidavit of Lorinda Hammond-McCutchen, ¶ 9 (alterations supplied).

[33] Second Affidavit of Lorinda Hammond-McCutchen, at 2.

[34] Doc. no. 106, Ex. H (Deposition of Tim Glover), at 11-12 [hereinafter Deposition of Tim Glover].

[35] *Id.* at 13.

[36] First Affidavit of Lorinda Hammond-McCutchen, ¶ 10; Second Affidavit of Lorinda Hammond-McCutchen, at 2-3; Deposition of Tim Glover, at 55-56.

[37] Deposition of Tim Glover, at 55-56.

about her observations of plaintiff at the Orange Beach conference, her belief that plaintiff was then "under the influence of something," and that she "had heard in the recovery community that [plaintiff] was doctor shopping, but that [she] was not sure of that."[38]

Because of their professional interactions, Hammond-McCutchen's experience with perceiving probable drug-induced intoxication based upon her observations, and her role as an official with the county court, Glover believed Hammond-McCutchen's statements to be both credible and reliable.[39]   At that point, Glover had investigated

---

[38] First Deposition of Lorinda Hammond-McCutchen, ¶ 10; Second Affidavit of Lorinda Hammond-McCutchen, at 2-3; Deposition of Tim Glover, at 55-56.  The court will pause to note that plaintiff's cites throughout the portion of her statement of facts to "PES Exhibit J," which is a copy of defendants' responses to plaintiff's requests for admission related exclusively to the news article published by the *Times Daily* Newspaper, appear to be an error.  Moreover, plaintiff again fails to "cit[e] to particular parts of . . . [the] affidavit[]" for each assertion of fact made as required by Rule 56(c) and the Uniform Initial Order, doc. no. 36, at 15-17, and, accordingly, this court has ignored paragraph seven of plaintiff's statement of facts in its entirety.  *See* Fed. R. Civ. P. 56(e)(2); *see also* Fed. R. Civ. P. 56(c)(3).

[39] Deposition of Tim Glover, at 55-57, 60-63.  Plaintiff, again, wishes to dispute the characterization of the information Hammond-McCutchen conveyed to Glover as "credible firsthand information."  Plaintiff's Response to Defendants' Motion for Summary Judgment, at 5.  The very sentence plaintiff uses to express this dispute, however, internally demonstrates why this dispute is wholly without merit:  "Hammond stated conclusively that she did not give him any firsthand information other than her observations . . . ."  *Id.*  Moreover, in Hammond-McCutchen's second affidavit, apparently taken *by plaintiff's counsel*, she again reiterates that she "personally observed" plaintiff acting in a manner that led her to "believe[] she was at that time under the influence of something."  Second Affidavit of Lorinda Hammond-McCutchen, at 2, 4 (alterations supplied).  Information based upon direct observation is, of course, firsthand information by any definition with which this court is familiar.  The court will only address plaintiff's apparent implication that Hammond-McCutchen's information could only be firsthand if she actually observed plaintiff fraudulently obtaining and consuming specified controlled substances and consuming them by reiterating that probable cause "does not require convincing proof, and need not reach the same standard of conclusiveness and probability as the facts necessary to support a conviction."  *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003).

approximately ten cases of suspected "doctor shopping" involving individuals who had obtained multiple, overlapping controlled substance prescriptions from multiple doctors, each of which, to his knowledge, had led to a conviction.[40]  His conversation with Hammond-McCutchen led him to believe plaintiff was engaged in the same conduct.[41]  Accordingly, he opened an investigation into plaintiff's activities.[42]

As part of the state's Prescription Drug Monitoring Program, the Alabama Department of Public Health ("DPH") maintains a database of all controlled substance prescriptions filled in Alabama by state-licensed pharmacists.[43]  *See* Ala. Code § 20-2-210 *et seq.*  Agent Glover had applied for and received an account with the DPH that permitted him to request records from the database.[44]  *See* Ala. Admin.

---

[40] Deposition of Tim Glover, at 20-23, 36-37.

[41] *Id.* at 55-63.

[42] *Id.* at 59-61.

[43] *Id.* at 40-49.

[44] *Id.* at 40, 43, 49; doc. no. 106, Ex. E, Tab 3, at 1 (listing a PDMP Account ID).  Plaintiff again has disputed this fact, but only by citing to the document itself and then attempting a tortured parsing of the language of the submission Glover indisputably made to the ADH.  *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 5.  The court does not understand plaintiff's dispute with respect to this assertion of fact.  Apparently, plaintiff contends that Glover never completed a law enforcement report request because she does not believe the cited document is, in fact, such a request.  However, that phrase — "law enforcement report request" — is the *title of the document* that both defendants and plaintiff cite (a printout of the online submission form Glover completed and submitted to the DPH).  Plaintiff has given no indication that she disputes that the online form was in fact completed and submitted to the Department of Public Health or that the copy in the record is not a true and accurate copy of that online form.  Hence, plaintiff's citation to that document fails entirely to support her dispute that the document is what its title says it is, and is far from sufficient to support any assertion that Glover never completed the form or sent it electronically to the ADH.  Hence, the fact is deemed admitted.  *See* Fed. R. Civ. P. 56(e)(2); doc. no. 34, at 15-17.

Code § 420-7-2.13(2).[45]  On November 30, 2007, Glover filled out an online "Law

Enforcement Report Request" form for the records of all prescriptions for controlled

substances that plaintiff had filled between January 1, 2006, and November 30,

2007.[46]  Glover also completed and faxed a duly executed affidavit, copied in

structure from a form DPH supplied to him at the time he registered for the

database,[47] averring:  (1) that he was an investigator with the LCDTF; (2) that the

LCDTF was then conducting an investigation involving plaintiff; (3) that the

information was being requested pursuant to an active investigation; (4) that he had

probable cause to obtain the information; and (5) that all information in the electronic

request related only to the subject of the investigation.[48]

---

[45] This regulation provides, as it did during the relevant time, that:  "Law enforcement agencies shall pre-register with the Prescription Drug Monitoring Program to receive an ID and password to access a request form.  Law enforcement agencies will request a report from the Prescription Drug Monitoring Program on an individual or health care licensee and will certify that requested information is pursuant to an active investigation."  Ala. Admin. Code § 420-7-2.13(2).

[46] Doc. no. 106, Ex. E, Tab 3, at 1 (copy of that request); Deposition of Tim Glover, at 40, 46-49.

[47] Doc. no. 106, Ex. E, Tab 5 (copy of "Sample" Affidavit); Deposition of Tim Glover, at 54.

[48] *See* doc. no. 106, Ex. E, Tab 4 (copy of "Affidavit for Prescription Drug Report").  Plaintiff disputes this fact as well, but, again, the dispute has nothing to do with the fact defendants have asserted.  Plaintiff does not contend, and certainly provides no evidence supporting any such contention, that this affidavit was not duly completed with the information listed therein and faxed to the DPH.  Rather, plaintiff essentially argues that the information Glover provided in the affidavit was false because the information upon which he based the statement of probable cause was legally inadequate.  However, the substance of defendants' statement of fact is simply a description of the text of Glover's affidavit as shown by the evidence they have submitted and the fact that it was faxed to the DPH.  The court is not in the least impressed with plaintiff's incessant attempts to deploy legal arguments in her statement of facts, in direct and flagrant contradiction of the directives set forth in the Uniform Initial Order entered in this action, doc. no. 34, at 16-17.  Moreover, plaintiff has

11

DPH reviewed the information that Glover submitted and granted his request for access, emailing him a list of prescriptions for controlled substances plaintiff had filled.[49] The information showed that, between August 2006 and November of 2007, plaintiff had filled forty-seven prescriptions for controlled substances from eleven different doctors in two states at eight different pharmacies.[50] Thirty-three of these were prescriptions for opioids, primarily oxycodone and hydrocodone, and the rest were for various barbituates, high-potency benzodiazepine sedatives, and muscle relaxants.[51] Plaintiff does not dispute the factual accuracy of the information in the DPH report.[52] Glover rearranged the information he was provided into a

provided no citation and therefore, pursuant to both that order and Fed. R. Civ. P. 56(e)(2), this fact is deemed admitted. Plaintiff's citations for the assertion that "Tim Glover never prepared an affidavit stating probable cause, and never submitted the same to the Alabama Department of Public Health" absolutely do not support that proposition. Plaintiff's Response to Defendants' Motion for Summary Judgment, at 10. The cited portions of Glover's deposition simply address plaintiff's counsel's questions about what facts Glover *set forth in the affidavit he indisputably did submit*. Plaintiff seems to be asserting that Glover never prepared an affidavit *setting out the facts* upon which he based his statement that he had probable cause. A party's statement of facts is not the place for legal semantics and, again, the court deems this factual assertion abandoned as entirely unsupported by defendants' citation. *See* doc. no. 34, at 15-17; *see also infra*, part III.B.2 (discussing plaintiff's contention that the affidavit was legally insufficient).

[49] Deposition of Tim Glover, at 44, 49; doc. no. 106, Ex. E, Tab 6, at 1-3. Importantly, plaintiff does not dispute this factual assertion. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 6.

[50] *See* doc. no. 106, Ex. E, Tab 6; *see also* doc. no. 106, Ex. E, Tab 2.

[51] *See* doc. no. 106, Ex. E, Tab 6; *see also* doc. no. 106, Ex. E, Tab 2. The specific drugs included Endocet (better known as Percocet), Carisoprodol (better known as SOMA), Clonazepam (better known as Klonopin), Diazepam (better known as Valium), Meporizne (better known as Demorol), in addition to the above-listed opioids and barbituates.

[52] First Deposition of Brenda Tucker, at 163.

chronologically organized spreadsheet and discovered that, on seven occasions during that fourteen month period, plaintiff had filled prescriptions from different medical professionals that overlapped in time.[53]  That is, at least seven times, plaintiff filled a prescription from one doctor that the records showed was intended to last a certain number of days, and then filled another prescription for the same or a similar compound from a different doctor before the previously filled prescription was scheduled to run out.[54]

According to Glover, "[t]here [were] overlapping prescriptions, multiple doctors, different pharmacies, different cities.  It fit the evidence that [he had] seen in other cases."[55]  Based upon that evidence, Glover went before a Lauderdale County Magistrate on December 5, 2007, and secured a warrant for plaintiff's arrest.[56]  That same evening, Glover and two officers of the Tuscumbia Police Department executed the warrant.[57]  Plaintiff peaceably surrendered outside her home, was taken briefly to jail, and then bonded out that evening.[58]

---

[53] Deposition of Tim Glover, at 69-70; doc. no. 106, Ex. E, Tab 7, at 1-4 (copy of spreadsheet created by Agent Glover).

[54] *See* doc. no. 106, Ex. E, Tab 2, at 1-3; *see also* Deposition of Tim Glover, at 78-79.

[55] Deposition of Tim Glover, at 78-79 (alterations supplied).

[56] Doc. no. 106, Ex. K (Certified Copy of court file from *State of Alabama v. Brenda Hawkins*, DC-07-3500 in the District Court of Lauderdale County, Alabama), at 5-6 (copy of arrest warrant and proof execution).

[57] *Id.*

[58] *See* First Deposition of Brenda Tucker, at 141-50, 187; Second Deposition of Brenda Tucker, at 17; Deposition of Tim Glover, at 81-87; *see also* doc. no. 106, Ex. K, at 7-10.

One week later, on December 12, 2007, Lauderdale County District Attorney Christopher Connolly opened a criminal prosecution against plaintiff on seven counts of unlawful possession of a controlled substance in violation of Alabama Code § 13A-12-212.[59]   Six days later, however, D.A. Connolly filed a "Motion to *Nolle Pross*" the case on the grounds that it had become "apparent that Lauderdale County may not [have] be[en] the appropriate jurisdiction for the prosecution of th[e] matter."[60]   The motion added that "[t]he investigation [was] on-going."[61]   Plaintiff's criminal defense attorney filed a motion to dismiss for lack of personal and subject matter jurisdiction on the same day.[62]   In the meantime, Glover had collected additional corroborating evidence from two of plaintiff's physicians and, when the case was dismissed, he turned all of his materials relating to plaintiff over to the Alabama Bureau of Investigation.[63]

As was his common practice, Glover wrote a brief press release about plaintiff's arrest and submitted it for review to his supervisor, then director of the

---

[59] *See* doc. no. 106, Ex. K (Certified Copy of court file from *State of Alabama v. Brenda Tucker*, DC-07-3500), at 1; Deposition of Tim Glover, at 64.

[60] Doc. no. 106, Ex. K, at 14 (Motion to *Nolle Pross* in *State of Alabama v. Brenda Hawkins*, filed by District Attorney Christopher E. Connolly on December 18, 2007) (alterations supplied); *see also* Deposition of Tim Glover, at 64; First Deposition of Brenda Tucker, at 197.

[61] Doc. no. 106, Ex. K, at 14 (alterations supplied).

[62] *Id.* at 13.

[63] Deposition of Tim Glover, at 22, 51-53, 64.

LCDTF, Myron Crunk ("Crunk").[64]   After Crunk approved the text of the release, Glover faxed it to the *Times Daily*, the local newspaper for Lauderdale and Colbert Counties, on the morning of December 7, 2007.[65]   It is undisputed that the information contained in that release was factually accurate.[66]   However, it is also undisputed that the article published the following day "contained two falsehoods" that plaintiff alleges were defamatory.[67]   Specifically, the article claimed that plaintiff's home was searched, when in fact it was not, and claimed that, "as a result of the search," she had been "charged with seven counts of unlawful possession of a controlled substance," when the charges, of course, could not have been related to a search that never occurred.[68]   There is no evidence that Glover had any contact with the author of the article, Tom Smith, beyond sending the press release to the *Times*

---

[64] *Id.* at 100-02; doc. no. 106, Ex. E, Tab 8 (copy of the press release); doc. no. 106, Ex. I (Deposition of LCDTF Director Myron Crunk), at 18-19, 39-40.

[65] Deposition of Tim Glover, at 100-02; doc. no. 106, Ex. E, Tab 8 (copy of the press release); doc. no. 106, Ex. L (Deposition of *Times Daily* Reporter Tom Smith), at 16-17; doc. no. 106, Ex. I (Deposition of LCDTF Director Myron Crunk), at 39-40.

[66] *See* First Deposition of Brenda Tucker, at 205-06; doc. no. 106, Ex. M (Tom Smith, "Freedom House Director Arrested on Drug Charges," *Times Daily*, Dec. 8, 2007); Deposition of Agent Tim Glover, at 103. *Compare* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 6, *with* Defendants' Brief in Support of their Motion for Summary Judgment, at 15, ¶ 48.

[67] *See* Deposition of Tim Glover, at 103; Plaintiff's Response to Defendants' Motion for Summary Judgment, at 39; doc. no. 106, Ex. L (Deposition of *Times Daily* Reporter Tom Smith), at 24-26.

[68] *See* First Deposition of Brenda Tucker, at 205-08; Deposition of Tim Glover, at 103; Plaintiff's Response to Defendants' Motion for Summary Judgment, at 39; doc. no. 106, Ex. L (Deposition of *Time sDaily* Reporter Tom Smith), at 24-26; doc. no. 106, Exs. N & O.

*Daily*.[69]  Crunk cannot remember whether he had any conversation with Tom Smith, and Smith, likewise, has no recollection of any conversation with Crunk.[70] Nonetheless, Crunk's name does appear in the allegedly defamatory article as a "source," even though his name appeared nowhere in the press release sent to the *Times Daily*.[71]  Plaintiff delivered a demand for a retraction of those two portions of the article approximately six months later, on June 4, 2008, and the *Times Daily* ran a retraction shortly thereafter.[72]

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[73] "[A] party may file a motion for summary judgment at any time until 30 days after the

---

[69] *See* Deposition of Tim Glover, at 101-02; doc. no. 106, Ex. L (Deposition of *TimesD aily* Reporter Tom Smith), at 19-20, 42.

[70] Doc. no. 106, Ex. I (Deposition of LCDTF Director Myron Crunk), at 37-38, 42; doc. no. 106, Ex. L (Deposition of *Times Daily* Reporter Tom Smith), at 18-19, 24-26, 42.

[71] Doc. no. 106, Ex. M (copy of article); doc. no. 106, Ex. I (Deposition of LCDTF Director Myron Crunk), at 44.

[72] *See* doc. no. 106, Exs. N ("Demand for Retraction") & O ("Correction").

[73] Rule 56 was amended, effective December 1, 2010, in conjunction with a general revision of some of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "*will not affect continuing development of the decisional law* construing and applying these phrases."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

close of all discovery." Fed. R. Civ. P. 56(b).  Summary judgment is proper "against

a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at

trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'In making this

determination, the court must review all evidence and make all reasonable inferences

in favor of the party opposing summary judgment.'"  *Chapman v. AI Transport*, 229

F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d

918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not

unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a

possibility, for such an inference is not based on the evidence, but is pure conjecture

and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th

Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material to an issue affecting the*
> *outcome of the case*.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

### III.  DISCUSSION

**A.     Plaintiff's Abandonment of Her Abuse of Process Claims**

At the outset, the court observes that plaintiff has marshaled no argument whatsoever to counter defendants' assertion that they are entitled to summary judgment on both plaintiff's state and federal abuse of process claims.  In her brief, plaintiff only mentions these claims, contained in Counts V and VI of the complaint as amended, by stating that they are "subsumed by the malicious prosecution claim."[74] This single sentence contains no clear reference to plaintiff's state-law claim for abuse of process.[75]  "[T]he law [is] by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."  *Norelus v. Dennys, Inc.*, — F.3d —, No. 07-14077, 2010 WL 5298847, at *24 (11th Cir. Dec. 28, 2010) (citation and quotation marks omitted) (alterations added).  As plaintiff has failed to brief either of her abuse of process claims, she has abandoned them and, therefore, summary judgment is due to be granted as to the claims contained in Counts V and VI.

**B.     Plaintiff's Claims Under 42 U.S.C. § 1983**

---

[74] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 32; doc. no. 1 (Original Complaint), ¶¶ 50-65.

[75] *Id.*

### 1.    Section 1983 claims against Director Myron Crunk

Before delving into the merits of plaintiff's claims of alleged violations of her constitutional rights, asserted pursuant to 42 U.S.C. § 1983, the court notes that defendants contend that "[t]he undisputed evidence in this case reveals that Crunk had no involvement in obtaining the warrant for plaintiff's arrest or with any prosecution relating to the same."[76]   Accordingly, they argue, plaintiff's § 1983 claims against defendant Myron Crunk must fail.   Plaintiff, albeit *sub silentio*, concedes the point.   Crunk's name does not appear anywhere in the portion of plaintiff's brief addressing individual liability for a § 1983 violation.   As previously discussed, an "argument not made is waived." *Harris v. Plastics Manufacturing. Co.*, 617 F.2d 438, 440 (5th Cir. 1980).[77]   Summary judgment is, therefore, due to be granted in favor of Myron Crunk as to all claims asserted against him pursuant to § 1983.

### 2.    Individual capacity claims against Agent Tim Glover

The only federal-law claims that remain are plaintiff's allegations that defendant Glover maliciously prosecuted her, and that the City of Florence is liable for Glover's actions.   Plaintiff's brief also appears to assert an independent "Section

---

[76] Defendants' Brief in Support of their Motion for Summary Judgment, at 20.

[77] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

1983 Illegal Seizure Claim."[78]  Defendants, too, address such a claim.[79]  It is not entirely clear from the complaint that plaintiff ever pled a freestanding false arrest claim, since the count containing the factual allegations that might support such a claim is something of a Frankenstein's monster, haphazardly merging multiple limbs of state and federal law.[80]  Nevertheless, as will become apparent, both plaintiff's claim for malicious prosecution and any claim for false arrest that she may have asserted hinge critically on whether Agent Glover had probable cause for her arrest. Therefore, the court will treat them as facets of the same claim.

In *Albright v. Oliver*, 510 U.S. 266 (1994) (plurality opinion), the Supreme Court reiterated that § 1983 is not an independent font of substantive rights, but instead serves only as a vehicle "for vindicating federal rights elsewhere conferred." *Id.* at 271.  A majority of the Court in *Albright* rejected a claim that a malicious prosecution violates an individual's substantive due process rights, but left open the possibility that such a claim could proceed under the Fourth Amendment.  *Id.* at 275; *id.* at 281 (Kennedy, J., concurring); *id.* at 286, 291 (Souter, J., concurring).  The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983."  *Wood v.*

---

[78] *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 30.

[79] *See* Defendants' Brief in Support of their Motion for Summary Judgment, at 23-26.

[80] *See* doc. no. 1 (Original Complaint), ¶¶ 25-34.

*Kesler*, 323 F.3d 872, 881 (11th Cir. 2003); *accord Grider v. City of Auburn, Alabama*, 618 F.3d 1240, 1256 (11th Cir. 2010).

"To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things:  (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Id.* (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004); *Wood*, 323 F.3d at 881).  "When malicious prosecution is brought as a federal constitutional tort, the outcome of the case does not hinge on state law, but federal law, and does not differ depending on the tort law of a particular state." *Wood*, 323 F.3d at 882 n.17. "[F]or purposes of a § 1983 malicious prosecution claim, the constituent elements of the common law tort of malicious prosecution include[]:  (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Id.* (alterations supplied).

Of great importance in the present action, it is well established that "the existence of probable cause defeats a § 1983 malicious prosecution claim." *Grider*, 618 F.3d at 1256 (citing *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008)). Similarly, "[t]he existence of probable cause at the time of arrest constitutes an absolute bar to a section 1983 action for false arrest." *Case v. Eslinger*, 555 F.3d

1317, 1326-27 (11th Cir. 2009) (internal quotation marks, citation, and ellipsis omitted) (bracketed alteration in original).  Hence, if probable cause existed for Glover to arrest plaintiff, both of her § 1983 claims against him fail.

Probable cause to arrest an individual exists where the "facts and circumstances [are] 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (alterations supplied) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003).  "The probable-cause standard rests on 'a practical, nontechnical conception affording the best compromise that has been found for accommodating' the 'often opposing' interests of law enforcement and individual liberty."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 566 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949) (Jackson, J., dissenting)). "Probable cause is 'judged not with clinical detachment but with a common sense view to the realities of normal life."  *Rank v. Evans*, 133 F.3d 1325, 1435-36 (11th Cir. 1998) (quoting *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990)). "[O]nly the probability, not a *prima facie* showing, of criminal activity is the standard of probable cause." *Illionis v. Gates*, 462 U.S. 213, 235 (1983) (internal quotation

marks and citation omitted) (alteration added).  "Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003) (citation and internal quotation marks omitted) (alterations in original).  "Simply put, . . . probable cause exists whenever an officer reasonably believes that an offense is being committed." *Id.* at 1090.

"Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed." *Case*, 555 F.3d at 1327. "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff.'" *Grider*, 618 F.3d at 1257 (quoting *Kingsland*, 382 F.3d at 1232) "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that actual probable cause is present, and in such cases those officials should not be held personally liable." *Von Stein v. Brescher*, 904 F.2d 572, 589 (11th Cir. 1990) (internal citations, quotation marks, and ellipses omitted). Accordingly, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause existed are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citation and internal quotation marks omitted) (alterations

added).

"Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime." *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004). Here, the warrant for plaintiff's arrest was based upon seven counts of unlawful possession of a controlled substance in violation of Alabama Code § 13A-12-212.[81] That provision states, in relevant part, that "A person commits the crime of unlawful possession of controlled substance if . . . [she] obtains by fraud, deceit, misrepresentation or subterfuge or by the alteration of a prescription or written order or by the concealment of a material fact or by the use of a false name or giving a false address, a controlled substance enumerated in Schedules I through V." Ala. Code § 13A-12-212(a)(2) (alterations and omissions supplied).

The court has no difficulty whatsoever in concluding that Glover had actual probable cause to effect the arrest of plaintiff for this offense. He had an uncommonly reliable informant in Lorinda Hammond-McCutchen, in that she was an officer of the county court. The information she provided was abnormally credible, in the sense that she both knew plaintiff for years beforehand and had particular expertise in detecting whether an individual was under the influence. Similarly, the

---

[81] *See* doc. no. 106, Ex. K, at 5.

rumors of doctor-shopping she conveyed to Glover had extra weight, in that they emerged from a community of individuals who had similar expertise in detecting substance abuse and of which plaintiff was a well-known and well-respected member. Moreover, the fact that Hammond-McCutchen formed the conclusion that plaintiff was under the influence based upon firsthand observation in a context in which inebriation would naturally seem extraordinarily offensive — *i.e.*, at a meeting of substance abuse treatment professionals — strongly corroborated the veracity of the information she provided to Glover.  Viewed objectively, Hammond-McCutchen's position with the court and her regular interactions with Glover, coupled with her awareness that Glover was an agent specially dedicated to investigating controlled substance violations, indicate a strong disincentive to lie. *See United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir.1995) (holding that a tip is corroborated when given in "circumstances under which [the informant] is unlikely to lie" because a falsehood "would likely be discovered in short order and favors falsely curried would dissipate rapidly") (alterations supplied).

Agent Glover then independently corroborated the information that Hammond-McCutchen had provided by requesting and receiving a list of controlled substance prescriptions plaintiff had filled that was created by an agency of the State of Alabama specifically charged with maintaining and dispensing  information of that

variety. Authentication of the details of a tip through independent investigation has long been recognized as making the conclusion that probable cause exists substantially more likely. *E.g.*, *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002) (collecting some of the many cases in which a tip corroborated by independent investigation amounted to probable cause for an arrest). Alabama law dictated in relatively thorough detail both how the information contained in the prescription drug monitoring report issued to Agent Glover was to be collected and maintained, and the circumstances under which the Alabama DPH would furnish such a report to law enforcement investigators, like Glover. *See* Ala. Code. § 20-2-210, *et seq.* In short, Glover had both an unusually reliable tip and unusually reliable corroboration of that tip.

Accordingly, the court holds that Glover had actual probable cause for plaintiff's arrest. This holding is further corroborated by the magistrate's issuance of a warrant for plaintiff's arrest. "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236. There is no evidence that the warrant was secured by subterfuge or obfuscation and the magistrate's agreement that probable cause for the arrest existed bolsters this court's conclusion. Because probable cause existed, plaintiff's § 1983 claims for malicious prosecution and illegal seizure must fail. *See, e.g.*, *Rushing v. Parker*, 599 F.3d 1263,

1265 (11th Cir. 2010).   Further, even were this court to ignore this obvious conclusion, it is equally plain that Glover had sufficient "arguable probable cause" to entitle him to qualified immunity with respect to both of these claims.  *See id.* at 1266.

Plaintiff advances three distinct arguments why this self-evident conclusion should not bar her federal claims.  First, she contends that there is no basis in the language of the statute under which she was charged to indicate that it criminalizes "doctor-shopping."[82]  She supports this argument by asserting that there have been no reported cases in which individuals have been convicted of doctor-shopping under Alabama's unlawful possession of controlled substances statute.   However, as outlined above, the language of § 13A-12-212 of the Alabama Code is quite broad; and, while plaintiff is correct that the words "doctor-shopping" are not used as such in the text, it is plain that doctor shopping would fall within its ambit.  The statute criminalizes obtaining a controlled substance by prescription through " fraud, deceit, misrepresentation or subterfuge . . . or by the concealment of a material fact . . . ."  *Id.* Conduct matching Glover's "working definition" of doctor-shopping — obtaining from "multiple doctors, multiple prescriptions [filled at] multiple pharmacies, generally outside the hometown of the person . . . and overlapping days on [those]

---

[82] *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 21-25.

prescriptions" — plainly fits within that definition.[83]  According to plaintiff's own testimony, her doctors required her to sign contracts acknowledging that failure to inform them about overlapping controlled substances prescriptions could violate the controlled substances statute.[84]  District Attorney Connolly apparently agreed that doctor-shopping could be prosecuted under § 13A-12-212, as he brought charges against plaintiff based upon violations of that statute.[85] The court is satisfied that the lack of *reported* caselaw directly addressing "doctor-shopping" in no way vitiated Glover's probable cause to believe that plaintiff had violated Alabama's controlled substance possession statute.

Second, plaintiff contends that Glover obtained the prescription drug monitoring report from DPH illegally, either because he did not have probable cause to seek it, or that the paperwork he provided to obtain it was legally insufficient.[86] Neither of these contentions has merit or any bearing upon the determination of

---

[83] Deposition of Tim Glover, at 19 (alterations supplied); *see also id.* at 60-61, 78-79.

[84] First Deposition of Brenda Tucker, at 204-05; *see also, e.g.*, doc. no. 106, Ex. D, at 2 ("Patient Physician Agreement" between plaintiff and Dr. George Evans).  Further, at least some of plaintiff's doctors were concerned that she was seeking multiple overlapping prescriptions from multiple doctors and made efforts to communicate among themselves to prevent that from occurring. *See* First Deposition of Brenda Tucker, at 113, 199-204; doc. no. 106, Ex. C, at 2-3; doc. no. 106, Ex. D, at 3-5 (stating that one of plaintiff's physicians after plaintiff had "claim[ed] that ultram was Stolen" had a "lenghty [*sic*] discussion about true recovery from drug dependence, she understands no narcotics will be prescribed after surgery"); doc. no. 106, Ex. F, at 2.

[85] Doc. no. 106, Ex. K, at 1, 13.

[86] *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 15-19, 26-27, 29-32.

whether Glover had constitutionally adequate probable cause for plaintiff's arrest. According to a provision of the Alabama Code now designated § 20-2-214(5),[87] law enforcement officials are required to submit, in an application for access to the controlled substances database, an "affidavit stating probable cause for the use of the requested information."  Ala. Code § 20-2-214(5).  Plaintiff contends that this provision requires an affidavit stating the facts that support the official's assertion that he has probable cause to use the requested information and that, therefore, Glover's simple averment that he "ha[d] probable cause to obtain the requested information"[88] did not comply with the statutory requirement.  In a vacuum, plaintiff's argument could have some force.  However, the text is clearly amenable to the reading that DPH gave it — *i.e.*, that it requires only a law enforcement official's declaration that he has probable cause in a sworn affidavit.  It is equally clear that DPH considered Glover's affidavit sufficient, since it actually sent him the information he requested.  Moreover, it is undisputed that the affidavit Glover submitted was copied from a form DPH furnished to him.  Thus, plaintiff's argument that Glover's affidavit was legally insufficient must fail.

Plaintiff further argues that Glover did not, in fact, have probable cause to

---

[87] At the relevant time, the provision was at Ala. Code § 20-2-214(4).  However, the provisions are identical and have merely been renumbered.  For the sake of simplicity, the court cites to the present placement of this provision.

[88] Doc. no. 106, Ex. E, Tab 4 (alterations supplied).

access the database and, therefore, that his averment to the contrary in the affidavit was false and the information he received from DPH was illegally obtained. Plaintiff contends that "Glover would [have] need[ed] the facts necessary to obtain a search warrant in order to have probable cause to access the Database."[89] That, however, is not what the Alabama Legislature wrote in § 20-2-214. Presumably, the legislature was well aware that an "officer engaged in the often competitive enterprise of ferreting out crime . . . may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy [of his affairs]." *Steagald v. United States*, 451 U.S. 204, 212-13 (1981) (internal citations and quotation marks omitted) (alterations supplied). Further, the legislature was undoubtedly aware that DPH would not have expertise in performing the sensitive, "totality-of-the-circumstances" inquiry required of a magistrate determining whether there is probable cause for issuance of a search warrant. *See Foree*, 43 F.3d at 1576. Nor is there anything in the statute mandating that they do so. Most importantly, the legislature could have, but did not, require officers to secure a search warrant in order to obtain a controlled substances prescription report. The Alabama Legislature only required that law enforcement officials submit an affidavit "stating probable cause" along with

---

[89] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 17 (alterations supplied).

applications for access to the database.    Ala. Code § 20-2-214(5).    Glover

indisputably did so, and DPH clearly found Glover's affidavit sufficient.  Moreover,

for the reasons stated above regarding the extraordinary credibility and reliability of

Hammond-McCutchen's statements to Glover, this court is satisfied that probable

cause for a search of the variety here conducted would have existed in any event.

Accordingly, the report of the controlled substances plaintiff had received, showing

that she had filled overlapping prescriptions on seven occasions and a total of forty-

seven controlled substance prescriptions  in fourteen months, is properly considered

in determining that Glover had constitutionally adequate probable cause to arrest

plaintiff.

Finally, plaintiff maintains that "[t]he only fact that the list [Glover obtained

from the database] reveals is that [plaintiff] had a prescription for every drug on the

list."[90]  She argues that Glover could only reasonably have deduced that plaintiff had

obtained  any  of  the  controlled  substances  on  that  list  by  "fraud,  deceit,

misrepresentation, or subterfuge" by contacting her physicians.  Because he did not

do so, plaintiff asserts that Glover did not have actual or arguable probable cause.

However, the Supreme Court has made plain that

    innocent behavior frequently will provide the basis for a showing of

---

[90] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 22 (alterations
supplied).

probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands. . . .  In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.

*Gates*, 462 U.S. at 245 n.13.  Plaintiff undoubtedly is correct that the information Glover obtained from the prescription drug database showed that she had obtained controlled substances by means of facially valid prescriptions.  Yet, as defendants point out, one of the explicit purposes the Alabama Legislature had for creating the database in the first place was to permit precisely this variety of investigation to proceed.  *See* Ala. Code § 20-2-210.[91]  No one in this action argues that filling a prescription is a criminal activity, even if the prescription is for a controlled substance.  However, obtaining forty-seven controlled substance prescriptions, fourteen of which overlapped with one another, from eleven different doctors, filled at eight different pharmacies, over the course of fourteen months indicated the "'sufficient probability, not certainty, [that] is the touchstone of reasonableness under the Fourth Amendment.'"  *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (*en banc*) (quoting *Hill v. California*, 401 U.S. 797, 804 (1971)).  Even if Glover did not have specific evidence of what species of misrepresentation plaintiff used to obtain her prescriptions, he had quite enough "reasonably trustworthy information"

---

[91] *See also* doc. no. 117, at 6.

to justify an arrest.  *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996); *see also Adams v. Williams*, 407 U.S. 143, 149 (1972) ( "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."); *Brinegar*, 338 U.S. at 175 ("In dealing with probable cause . . . as the very name implies, we deal with probabilities."); *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813) ("[T]he term 'probable cause' . . . means less than evidence which would justify condemnation . . . ."); *Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir. 1996) ("There is a substantial difference between the quantum of proof necessary to constitute sufficient evidence to support a conviction and that necessary to establish probable cause.").

Accordingly, because he had actual probable cause or, in the alternative and at the very least, *arguable* probable cause, the court holds that defendant Glover is entitled to summary judgment as to plaintiff's § 1983 claims of malicious prosecution and false arrest.

### 3.    Plaintiff's claims against the City of Florence

As set forth above, the court holds that Glover had actual probable cause to arrest plaintiff.  The import of that determination, with respect to both of her remaining claims under § 1983, is that her constitutional rights were not violated. That determination is conclusive of any claims against the City.  *See City of Los*

*Angeles v. Heller*, 475 U.S. 796, 799 (1986) (concluding that when no constitutional violation is demonstrated, there is no basis for which to hold municipality liable); *Case*, 555 F.3d at 1328 (concluding that municipality was entitled to summary judgment where the court found that there was no constitutional violation); *Vineyard v. County of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993) ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise.").

Counterfactually, assuming Glover had only arguable probable cause (entitling him to qualified immunity even though a constitutional violation had occurred), summary judgment would still be granted in favor of the City as to plaintiff's § 1983 claims. Plaintiff has conceded that the City maintained no policy or custom that resulted in the deprivation of her rights.[92]   Instead, she argues that Glover is a policymaker and, therefore, that his actions may be directly attributed to City.[93]

Plaintiff is correct that, under a series of Supreme Court decisions, a municipality may be liable even for a single unconstitutional action if the actor is "an

---

[92] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 32.

[93] *Id.* at 33-37.  The court notes, at this juncture, that many of the facts plaintiff discusses in the section of her brief entitled "Why City of Florence is Liable Under § 1983" relate to defendant Crunk.  Yet, as outlined above, plaintiff has tacitly conceded that Crunk was involved in neither the investigation nor the arrest at issue in this case.  Further, plaintiff has not argued that Crunk should be liable as Glover's supervisor.  Accordingly, the court ignores those assertions that are irrelevant to whether the City can be liable for the actions of Glover.

official fairly deemed to represent government policy." *Doe v. School Board of Broward County, Florida*, 604 F.3d 1248, 1263 (11th Cir. 2010) (citation and internal quotation marks omitted).  Even so, the Eleventh Circuit has "strictly interpreted '*Monell*'s policy or custom requirement to preclude § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion.'" *Id.* at 1263 (quoting *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)).  The Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997).  "[W]hether a particular official has 'final policymaking authority' is a question of state law." *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989) (alterations supplied). Crucially, the determination of who has such final, unreviewable policymaking authority and, thus, whose actions may fairly be directly attributable to the governmental entity that employs him,"is a *question of law* to be resolved by the trial court judge." *Mandell v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989) (emphasis supplied).

It is beyond dispute that the plaintiff bears the burden to demonstrate, *as a matter of law*, that a defendant is a final policymaker. *E.g.*, *Copper v. Dillon*, 403

F.3d 1208, 1221 (11th Cir. 2005).  Here plaintiff argues that, because Glover had

discretion in pursuing his investigations, he had final policymaking authority.   Yet,

discretion is the necessary precondition to a determination that an individual

defendant is entitled to qualified immunity from a § 1983 claim.  *E.g.*, *Grider*, 618

F.3d at 1254 n.19.   Therefore, were plaintiff's facile assertion true, every

determination that an individual defendant is entitled to qualified immunity would

automatically render his employing entity liable.   This simply cannot be the case.

Plaintiff has not even argued that Glover's decisions were subject to no review by the

LCDTF board or by his direct supervisor, Myron Crunk.  *See Matthews v. Columbia*

*County*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("Local government liability can exist

when someone with final policymaking authority delegates that authority to someone

else.  But, the delegation must be such that the decision is not subject to review by the

policymaking authority.").  Plaintiff has even conceded, though perhaps accidentally,

that the LCDTF's board made "policy decisions [that] were related to day to day

operations . . . ."[94]  Moreover, the uncontroverted testimony indicates that Director

Crunk reviewed and made suggestions regarding how Glover executed his

decisions.[95]   Plaintiff has failed to demonstrate that Glover had the kind of

---

[94] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 35 (alterations supplied).

[95] Deposition of Tim Glover, at 103-06; doc. no. 106, Ex. I (Deposition of LCDTF Director Myron Crunk), at 20-24.

functionally unreviewable, final policymaking authority required to impute any of his actions directly to the City.

Summary judgment is due to be granted to the City because plaintiff's constitutional rights were not violated. In the alternative, even if the court assumes for the sake of argument that a constitutional violation occurred, the City would still be entitled to summary judgment because plaintiff has failed to establish any basis upon which the City could fairly be held liable for Glover's actions.

## C.    Plaintiff's State Law Claims

Having determined that summary judgment is due to be granted as to all of plaintiff's federal law claims, the court declines to exercise supplemental jurisdiction over the remaining state law claims plaintiff asserts in Counts II-IV of the original complaint. Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." *Id.* Further, the Eleventh Circuit has regularly reiterated that "'if the federal claims are dismissed prior to trial, [the Supreme Court's decision in *United Mine Workers v.*] *Gibbs*[, 383 U.S. 715 (1966)], strongly encourages or *even requires dismissal* of state claims.'" *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) (emphasis supplied) (alterations added) (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (citing *Gibbs*, 383

U.S. at 726)).  The remaining state law claims will, therefore, be dismissed without prejudice, and the court need not address the defenses to those claims asserted in defendants' motion for summary judgment.

## IV.  CONCLUSION AND ORDER

In accordance with the foregoing, defendants' motion for summary judgment[96] is due to be, and the same hereby is, GRANTED with respect to each of the claims plaintiff has asserted under 42 U.S.C. § 1983, contained in Counts I and V of her original complaint, as amended.[97]  Accordingly, all of plaintiff's federal-law claims are DISMISSED with prejudice.  Plaintiff has waived any objection to this court granting summary judgment as to the state-law abuse of process claim contained in Count VI of the complaint and, thus, it too is DISMISSED with prejudice.  Further, because the court declines to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c), contained in Counts II-IV of the original complaint, those state-law claims are hereby DISMISSED without prejudice.  Costs incurred herein are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 2nd day of February, 2011.

_____
United States District Judge

[96] Doc. no. 103.

[97] *See* doc. no. 1 (Original Complaint), ¶¶ 25-34, 50-59.

38